UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


PAUL THEURER                             )        CASE NO.  1:11CV2240
                                         )
                    Plaintiff            )        MAGISTRATE JUDGE
                                         )        GEORGE J. LIMBERT
        v.                               )
                                         )        **MEMORANDUM AND OPINION**
COMMISSIONER OF SOCIAL                   )
SECURITY ADMINISTRATION                  )
                                         )
                                         )
                    Defendant.           )


Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Paul Theurer Disability Insurance Benefits (DIB) and Supplemental Security (SSI).   The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his December 13, 2010 decision in finding that Plaintiff was not disabled because he could perform work in the national economy, and, therefore, was not disabled (Tr. 6-22).   The Court finds that substantial evidence supports the ALJ's decision for the following reasons:


**I.      PROCEDURAL HISTORY**

Plaintiff, Paul Theurer, filed his application for DIB and SSI on February 24, 2012, alleging he became disabled on January 27, 2010 (Tr. 121-133, 159).   Plaintiff's application was denied on June 3, 2010 (Tr. 50-55).  Plaintiff requested a hearing before an ALJ, and on November 4, 2010, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ, and a vocational

expert also testified (Tr. 23-46).

On December 13, 2010, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 6-22).  Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-5, 117-120).  Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Sections 405(g) and 1383©.

## II.      STATEMENT OF FACTS

Plaintiff was born on October 27, 1972, which made him thirty-seven years old on the alleged onset date (Tr. 17).  Plaintiff has completed two years of college (Tr. 17).  His past relevant work includes work as a mechanic, an auto detailer, and a medical assistant (Tr. 42-43).

## III.     SUMMARY OF MEDICAL EVIDENCE

A.      Physical impairments.

On September 22, 2009, Plaintiff saw his treating physician, Dr. Morton Singer, with complaints of chronic back pain with radiation to his bilateral thighs, particularly with bending, twisting, standing, walking, and lifting (Tr. 448).  Dr. Singer diagnosed fibromyalgia, lumbar nerve root injury, lumbar disc disease, and spinal stenosis of the lumbar region (Tr. 450).  An x-ray of Plaintiff's thoracic spine performed on September 22, 2009 revealed mild degenerative changes with mild scoliosis, and lab results from the same date showed negative rheumatoid factor and negative ANA (Tr. 452, 454, 483).  Dr. Singer referred Plaintiff to a rheumatologist for further evaluation (Tr. 450).

2

Plaintiff saw Dr. Rama Bandlamudi, M.D. in the rheumatology clinic at St. Louis University on September 29, 2009 and October 20, 2009 with complaints of chronic low back pain, fatigue, morning stiffness lasting 1.5 to 2 hours, diffuse swelling in his ankles and hands, joint pains in his hands and knees, and left leg and left hand pain with burning sensation in his hands (Tr. 376). Examination revealed diffuse tenderness in all joints and 18/18 positive tender points, confirming the diagnosis of fibromyalgia syndrome (Tr. 377-378).

On December 1, 2009, Dr. Morton Singer evaluated Plaintiff's complaints of moderate persistent back pain with decreased mobility, joint pain, and tingling in the legs, which he reported was aggravated by bending, twisting, walking, standing, and lifting (Tr. 445). On examination, Dr. Singer found decreased mobility, tenderness, and paravertebral muscle spasm (Tr. 447). To treat Plaintiff's lumbar disc disease and fibromyalgia, Dr. Singer increased the dosage of the Lyrica and continued his prescription for Vicodin (Tr. 447).

On January 7, 2010, Plaintiff saw Dr. Morton Singer again for treatment of his fibromyalgia (Tr. 437-439). Dr. Singer's treatment notes report that Plaintiff has moderate to severe fibromyalgia which had been present for the past two years, aggravated by lifting, movement, walking, and standing (Tr. 437). On examination, Dr. Singer found positive straight leg raising test, decreased mobility, and tenderness of Plaintiff's spine (Tr. 439).

On January 29, 2010, Plaintiff went to St. Louis University Hospital with complaints of back pain after moving furniture at work, which became worse with movement (Tr. 267). An x-ray revealed minimal spondylosis and no fracture or subluxation (Tr. 271). Examination revealed muscle spasm in the thoracic area and severe pain, and Plaintiff's injury was diagnosed as an acute myofascial strain (Tr. 268).

3

On February 1, 2010, Dr. Steven Cummings evaluated Plaintiff for thoracic strain for workers' compensation purposes (Tr. 283-287).  Plaintiff reported increased back pain after rearranging furniture in the employee break room and bringing a table up from the basement to the seventh floor (Tr. 284).  Plaintiff stated that he had chronic low back pain and a new, sharp constant grinding pain into the mid-thoracic back, which became worse with twisting, and was accompanied by tingling into the hands bilaterally (Tr. 284).  On examination, Dr. Cummings found diffuse tenderness of the mid-thoracic and paraspinal areas and increased thoracic pain with rotation and lateral bending of the torso, and diagnosed a thoracic strain (Tr. 287).  Dr. Cummings limited Plaintiff to seated duty only, lifting limited to five pounds, walking limited to and from his car, up to bathroom, up to lunch, out to car with self-paced walking to be made available throughout the shift, with return to full-duty expected February 12, 2010 (Tr. 283, 287).  On February 2, 2010, Dr. Cantrell stated that Plaintiff was not "unable to work" for workers' compensation purposes under the rationale that bedrest was not medically recommended, but he should not perform his regular job tasks (Tr. 282).

 On February 18, 2010, Plaintiff saw Dr. Singer for follow-up treatment of his persistent low back pain and fibromyalgia (Tr. 276-278).  Dr. Singer's examination revealed decreased thoracic and lumbar mobility, moderate kyphosis, posterior spine tenderness, paravertebral muscle spasm, bilateral lumbosacral tenderness, and severe pain with motion (Tr. 278).  Dr. Singer diagnosed lumbar disc disease with persistent low back pain, and a fibromyalgia exacerbation with depression (Tr. 278).  Dr. Singer opined that Plaintiff is "disabled from working due to back and leg pain and depression" (Tr. 278).  On February 18, 2010, Dr. Cantrell, a workers' compensation doctor who was evaluating Plaintiff for a thoracic strain, observed his low mood and noted his affect was "not bright" (Tr. 286).

On February 22, 2010, Plaintiff returned to Dr. Cantrell for a follow-up examination, which revealed lumbar spine pigmentation consistent with chronic heat pad use (Tr. 295).  Dr. Cantrell

4

restricted Plaintiff to lifting no more than ten pounds due to his thoracic strain/sprain (Tr. 281, 296). Plaintiff attended four of seven physical therapy appointments, cancelling two appointments secondary to pain (Tr. 302). Physical therapy notes report hypersensitivity to touch and positive Wadell's; however, physical examination indicated mechanical dysfunction, and the physical therapist acknowledged that conditions such as fibromyalgia, depression, and bipolar disorder may "sensitize" his soft tissue or make manipulative techniques contra-indicated due to pain response (Tr. 303). On March 10, 2010, Plaintiff returned to Dr. Cantrell with complaints of only slight improvement from physical therapy and worsening depression (Tr. 297). Dr. Cantrell opined that Plaintiff remained limited to lifting no more than ten pounds (Tr. 297-298, 301).

On March 30, 2010, after reviewing Plaintiff's negative MRI results, Dr. Cantrell modified Plaintiff's restrictions to lifting less than fifty pounds, and prescribed an additional two weeks of physical therapy (Tr. 367). On April 28, 2010, Dr. Cantrell opined that Plaintiff had reached maximum medical improvement, that his subjective pain complaints were in excess of any objective abnormalities on clinical examination or diagnostic studies, and that he was capable of performing all regular duty activities without restrictions (Tr. 370).

On May 31, 2010, Social Security medical consultant, Kevin Threlkeld, reviewed Plaintiff's medical file and determined that he could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand and/or walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday, should never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and should avoid concentrated exposure to vibration and hazards (Tr. 332-337).

On June 30, 2010, Plaintiff saw Dr. Singer and reported intermittent lower back pain associated with decreased mobility, spasms, and tenderness, which was aggravated by standing,

walking, and twisting (Tr. 422).  On examination, Dr. Singer found tenderness of the cervical and lumbar spine and moderate pain with motion (Tr. 424).  Dr. Singer reported that Plaintiff was still not responding to current treatment, and adjusted his medications (Tr. 424-425).

Between August 31, 2010 and September 8, 2010, Plaintiff saw Dr. Gerald A. Kennedy for chiropractic treatment for fibromyalgia, neck pain radiating into his left arm, back pain radiating into his leg, and numbness in his bilateral hands and feet (Tr. 401-403).  Dr. Kennedy found on examination joint dysfunction, tenderness, decreased range of motion, body imbalance due to short leg on left, and muscle spasm, and performed mechanical traction and trigger point therapy (Tr. 401-403).  A thermographic study revealed a temperature difference in the cervical area, indicating neurologic insult (Tr. 401).  Dr. Kennedy advised Plaintiff to get lateral support for his knee brace (Tr. 402).

On September 28, 2010, Plaintiff saw Dr. Morton Singer with a generalized exacerbation of his fibromyalgia for the past week, which manifested as moderate to severe pain with aching, throbbing, decreased mobility, and tenderness (Tr. 406).  On examination, Dr. Singer found decreased thoracic and lumbar mobility, moderate kyphosis, posterior spine tenderness, paravertebral muscle spasm, bilateral thoracic and lumbosacral tenderness, and positive straight leg raising test (Tr. 408).  Dr. Singer increased the dosage of Plaintiff's prescription for Flexeril, continued his prescription for Vicodin, and added Diclofenac, in an attempt to improve pain control for his fibromyalgia and lumbar disc disease (Tr. 408).

On October 1, 2010, Plaintiff's treating physician, Dr. Morton Singer, completed a Physician Assessment for Social Security Disability Claim (Tr. 405).  Dr. Singer diagnosed lumbar disc disease with severe low back pain and fibromyalgia with pain in the back and shoulders (Tr. 405).  Dr. Singer concluded that Plaintiff is "unable to stand, lift, bend, walk, or sit for more than thirty minutes without

pain," and that he is unable to work more than thirty to sixty minutes per day, as his endurance is affected by back pain and muscle pain (Tr. 405). Dr. Singer reported that Plaintiff's work injury exacerbated his chronic back pain, which then triggered his depression, he requires opiate analgesics, and he is unable to sustain work tasks in a sedentary setting, due to chronic pain even when sitting (Tr. 405).

      B.      Mental Impairments

On February 2, 2010, Dr. Morton Singer treated Plaintiff for moderate major depressive disorder (Tr. 273). Plaintiff reported psychiatric symptoms, including anxiety, depression, difficulty concentrating, inability to focus, mood swings, and sleep disturbance, which had been worsening since his recent work injury in January 2010, and had been present nearly every day in the past two weeks (Tr. 274, 434). Dr. Singer's mental status examination revealed depressed affect, anhedonia, anxiety, mood swings, and an overall picture that Plaintiff's symptoms were not responding to current treatment, which prompted Dr. Singer to alter his medication (Tr. 275, 436). Dr. Singer's records reflect that Plaintiff's symptoms are aggravated by conflict or stress at home or work (Tr. 273, 276).

On February 18, 2010, Plaintiff saw Dr. Singer for follow-up treatment of his moderate major depressive disorder and bipolar disease (Tr. 276-278). Plaintiff reported that his symptoms of anxious fearful thoughts, depressed mood, fatigue, loss of energy, poor concentration, indecisiveness, and sleep disturbance had been present more than half the days in the past two weeks (Tr. 430). Dr. Singer observed depressed affect, anhedonia, anxiety, and mood swings (Tr. 278). Dr. Singer diagnosed manic depressive disorder, and increased the dosage of the Seroquel to address his persistent depressed mood (Tr. 278). Dr. Singer opined that Plaintiff is "disabled from working due to back and leg pain and depression" (Tr. 278).

On March 18, 2010, Dr. Morton Singer treated Plaintiff's moderate major depressive disorder (Tr. 426). Plaintiff reported that he was continuing to experience anxious, fearful thoughts, depressed mood, diminished interest or pleasure, poor concentration, indecisiveness, sleep disturbance, and social isolation, which were aggravated by conflict, stress, and the winter season (Tr. 426). Dr. Singer observed Plaintiff's overall appearance to be depressed (Tr. 428). Dr. Singer diagnosed manic depressive syndrome, which remained symptomatic despite treatment compliance with Seroquel and Cymbalta (Tr. 428).

On June 3, 2010, Social Security medical consultant, Terry Dunn, Ph.D., completed a mental residual functional capacity assessment, and determined that Plaintiff is moderately limited to his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting (Tr. 350-351). Dr. Dunn further explained that Plaintiff is limited to simple to complex work activity with occasional interruptions in task focus, due to mood symptoms, and success more likely in heavily-routinized work settings (Tr. 352).

Plaintiff was also treated by Dr. Steven Stromsdorfer for his bipolar disorder (Tr. 492, 494-511). On July 2, 2010, an Attending Physician Statement completed by Dr. Stromsdorfer reported that Plaintiff "cannot work at all," as he psychiatrically meets criteria for being fully disabled, has been unable to work since January 2010 due to the primary diagnosis of bipolar disorder not otherwise specified, and his functioning is impacted by mood swings and high irritability level (Tr. 512-514). In another assessment dated October 21, 2010, Dr. Stromsdorfer reported that Plaintiff has a history of mood instability dating back to at least 2004, with total sobriety since 2004, and his persistent

8

mood swings, poor focus, poor sleep and energy and lack of motivation have worsened in the past two years (Tr. 492).  Dr. Stromsdorfer indicated on October 21, 2010 that Plaintiff had no improvement from May 4, 2010 to the most recent visit on September 28, 2010, and assigned a global assessment of functioning of sixty (Tr. 492).  Dr. Stromsdorfer opined that Plaintiff's diagnosis of bipolar disorder is "severe enough to warrant full disability," and he is "expected to remain unable to work for at least twelve months" (Tr. 492).  Dr. Stromsdorfer completed yet another assessment on October 21, 2010, in which he opined that Plaintiff has no useful ability to make occupational adjustments, performance adjustments, and personal-social adjustments, rating his ability to relate with co-workers, deal with the public, and interact with supervisors; deal with work stresses; function independently; understand, remember, and carry out simple, detailed, or complex job instructions; relate predictably in social situations, and behave in an emotionally stable manner as "poor or none" (Tr. 493).   Dr. Stromsdorfer's treatment records report that Plaintiff avoids leaving the house and is very volatile, depressed, and anxious (Tr. 494, 497, 499-500, 508).

On October 1, 2010, Plaintiff's treating physician, Dr. Morton Singer, completed an assessment, in which he opined that Plaintiff does poorly with stress, co-workers, and supervisors due to bipolar disease, and concluded that Plaintiff is precluded from any consistent work routine due to multiple medical and mental health conditions (Tr. 405).

On December 3, 2010, Dr. Stromsdorfer reported that Plaintiff's global assessment of functioning scores have been about sixty in the context of considerably reduced daily demands which would be expected to decline to fifty, if not worse, with the workplace demands of a structured work setting (Tr. 532).  Dr. Stromsdorfer reiterated his opinion that Plaintiff is clearly unable to function in his prior field, and his liability and concentration issues would get in the way of many other endeavors as well (Tr. 532).

## IV.    SUMMARY OF TESTIMONY

Plaintiff testified that his alleged disability is due to a combination of impairments.  The Plaintiff lives with his fiancé, who is his ex-wife, and son.  Most recently, he worked in January of 2010 as a medical assistant, and he, thereafter, applied for unemployment benefits.  However, he stated that he did not accept the benefits.  He settled his workers' compensation claim regarding his injury sustained on his most recent job.  He testified that he underwent treatment for drug and alcohol abuse in 2004, and he has not used drugs or alcohol since then.  In July of 2001, he developed spells, which currently result in dizziness and "spacing out."  These have dropped in frequency, but he still has a couple per day.  He does not drive, except when he needs to do so.  Last Wednesday, he drove to go to a doctor's appointment.  Dr. Black did not advise him to discontinue driving.  Due to fibromyalgia, he has pain and limited mobility.  Due to depression, he does not like to leave his house.  He went to Cleveland for a funeral, but he did not do the driving.  His medications result in extreme fatigue.  The Plaintiff testified that he could walk one block, stand ten minutes, and sit thirty minutes.  He could carry a gallon of milk.  In his left dominant hand, the ring finger goes numb.  One doctor said that he should have surgery for it, but he could not remember which doctor it was.  He cannot put socks on by himself.  His social activities consist of nothing.  On a good day, he could clean the counter top and stove, and he tinkers in the garage.  He has crying spells and feels useless (Tr. 25-42).

Thereafter, the ALJ obtained testimony from a vocational expert (VE) regarding Plaintiff's ability to work (Tr. 42-45).  The ALJ instructed the VE to consider a hypothetical individual who could perform work involving frequent lifting of ten pounds; occasional lifting of twenty pounds; sitting for six hours; standing or walking for six hours; occasional climbing of stairs or ramps (but never ropes, ladders, or scaffolds), balancing, stooping, kneeling, crouching, or crawling; no concentrated exposure to unprotected heights or dangerous machinery; simple instructions and non-

detailed tasks; and adaptation to only simple work changes during an eight-hour day (Tr. 42).  The

VE testified that such an individual could not do Plaintiff's past work, but could do other work in the

national economy, including work in the following occupations: unarmed security guard and single-

item cashier (Tr. 42-43).

## V.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

disability insurance benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful
      activity will not be found to be "disabled" regardless of medical
      findings (20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.    An individual who does not have a "severe impairment" will not be
      found to be "disabled" (20 C.F.R. 404.1520© and 416.920(C)(1992);

3.    If an individual is not working and is suffering from a severe impair-
      ment which meets the duration requirement, *see* 20 C.F.R. 404.1509
      and 416.909 (1992), and which meets or is equivalent to a listed
      impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of
      disabled will be made without consideration of vocational factors (20
      C.F.R. 404.1520(d)  and 416.920(d) (1992);

4.    If an individual is capable of performing the kind of work he or she
      has done in the past, a finding of "not disabled" must be made (20
      C.F.R. 404.1520(e) and 416.920(e) (1992);

5.    If an individual's impairment is so severe as to preclude the
      performance of the kind of work he or she has done in the past, other
      factors including age, education, past work experience and residual
      functional capacity must be considered to determine if other work can
      be performed (20 C.F.R. 404.1520(f) and  416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward

with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that

alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards.  *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997).  Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII.    ANALYSIS

Plaintiff asserts two assignments of error:

A.    Whether the ALJ committed substantial error by failing to properly

12

evaluate Plaintiff's medical evidence of record, including the opinions of Plaintiff's treating physicians, in reaching his decision that Plaintiff is not disabled.

B.     Whether the ALJ committed substantial error by relying on a hypothetical question to the vocational expert, which did not include all of the limitations that result from Plaintiff's medically-determinable impairments, in reaching his decision that Plaintiff is not disabled.

The ALJ applied the sequential evaluation process in this case.  At step one, the ALJ found that Plaintiff had no engaged in any substantial gainful activity since January 27, 2010, the alleged onset date of his disability (Tr. 11).  At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, degenerative changes of the thoracic spine with spondylosis, depression, and polysubstance abuse in remission (Tr. 11).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment in the Listing of Impairments (Tr. 11).

Thereafter, the ALJ assessed Plaintiff's RFC and found that he could perform a limited range of light work (Tr. 12).  The ALJ found that Plaintiff could perform light work involving frequent lifting of ten pounds; occasional lifting of twenty pounds; sitting for six hours; standing or walking for six hours; occasional climbing of stairs or ramps (but never ropes, ladders, or scaffolds), balancing, stooping, kneeling, crouching, or crawling; no concentrated exposure to unprotected heights or dangerous machinery; simple instructions and non-detailed tasks; and adaptation to only simple work changes during an eight-hour day (Tr. 12).

At step four, the ALJ found that Plaintiff was unable to perform his past relevant work (Tr. 17).  At step five, relying in part on VE testimony, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, he could perform work existing in significant numbers in the national economy, including work in the following occupations: unarmed security guard and single-item cashier (Tr. 17-18).  Hence, the ALJ determined that Plaintiff was not disabled within the

meaning of the Act (Tr. 18).

The Court concludes that the ALJ's decision that the Plaintiff was not disabled is supported by substantial evidence. In reaching his decision, the ALJ correctly determined that Plaintiff had severe impairments (Tr. 11). However, the ALJ also correctly determined that Plaintiff's impairments did not meet or medically equal an impairment in the Listing of Impairments, and that he remained capable of performing work existing in the national economy (Tr. 11, 17).

Plaintiff argues that the ALJ: (1) improperly evaluated Plaintiff's treating physicians' opinions; and (2) erred by relying on the VE's response to a hypothetical question that did not contain all the limitations imposed by his impairments (Pl's Br. 13-24).

Furthermore, Plaintiff argues that the ALJ improperly evaluated Dr. Singer's and Dr. Stromsdorfer's opinions (Pl's Br. 13-17). However, the undersigned believes that the ALJ provided valid reasons for discounting their opinions, and those reasons are supported by substantial evidence.

Opinions from treating sources are generally given more weight than opinions from other sources, but may be given controlling weight only if the treating source's opinions is (1) well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and (2) not inconsistent with other substantial evidence. 20 C.F.R. Section 404.1527(d)(2); SSR 96-2p, 1996 WL 374188. Conversely, "if a [treating] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

If a treating physician's opinion is not entitled to controlling weight, it is evaluated according to additional factors, including: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion by relevant medical evidence and by explanations from the treating source, the consistency of the opinion with the record as a whole, and any other factors which tend to support or contradict the opinion. *See,*

14

20 C.F.R. Section 404.1527(d)(2).  Although an ALJ is not required to discuss each of these factors, the ALJ must provide "good reasons" for the weight given to treating source's medical opinion.  *See,* 20 C.F.R. Sections 404.1527(d)(2).

The ALJ explained that he discounted Dr. Singer's opinion that Plaintiff had disabling physical limitations, in part, because it was inconsistent with and unsupported by the objective medical evidence (Tr. 15).  The ALJ supported this finding earlier in his decision by summarizing Dr. Singer's findings (Tr. 14).  The ALJ noted that a September 2009 x-ray showed only "mild" degenerative changes of the mid-thoracic spine, and only "mild" thoracic scoliosis (Tr. 14, 15, 483).  In July 2010, Dr. Singer found that Plaintiff's coordination was intact and a carotid Doppler study showed no significant disease (Tr. 14, 416, 479).  MRI and CT scans of Plaintiff's brain were likewise negative (Tr. 481-82).  These findings contradict Dr. Singer's opinion that Plaintiff had disabling physical limitations.

The ALJ further supported his finding that Dr. Singer's opinion was inconsistent with the objective medical evidence by discussing Dr. Black's examination findings (Tr. 15).  As th ALJ noted, Dr. Black found that Plaintiff had full motor strength, a normal stance, a normal gait, and a normal tandem gait (Tr. 15, 527).  The ALJ properly considered the inconsistency of Dr. Singer's opinion with Dr. Black's examination findings.

In addition to discounting Dr. Singer's opinion because it was inconsistent with the objective medical evidence, the ALJ also explained that Dr. Singer's opinion was inconsistent with other evidence, including Plaintiff's own statements and other treating physicians' opinions (Tr. 15).  While Dr. Singer assessed Plaintiff with disabling physical limitations, the ALJ noted that Plaintiff told Dr. Singer that his fibromyalgia and other symptoms were relieved with medications (Tr. 14, 406, 408, 422, 427, 432, 437, 456, 458).  In addition, the ALJ observed that both Dr. Cantrell and Dr. Cummings opined that Plaintiff was capable of performing work without restrictions (Tr. 15, 283 ["fit for full

duty"], 370 ["It remains my opinion he is capable of performing all regular duty activities without restrictions."]).  This evidence undermines Dr. Singer's opinion, and the ALJ correctly considered it in discounting that opinion.

Finally, the ALJ explained that some of Dr. Singer's statements addressed the ultimate issue of disability, which only the Commissioner may decide (Tr. 15).  20 C.F.R. Sections 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, at *2.  An opinion on an issue reserved to the Commissioner is not a medical opinion.  *Id.*  Rather, it is an administrative finding that is dispositive of a case, i.e., whether a claimant is disabled under the Act.  *Id.*  Final responsibility for deciding such an issue is reserved to the Commissioner.  Here, to the extent that Dr. Singer opined that Plaintiff was unable to "work" (Tr. 405), the ALJ correctly noted that the opinion was not entitled to controlling weight or special significance (Tr. 15).  In addition, the ALJ provided good reasons, supported by substantial evidence, for discounting Dr. Singer's opinion that Plaintiff was unable to work.

Thereafter, the ALJ explained that he discounted Dr. Stromsdorfer's opinion that Plaintiff had disabling mental limitations, in part, because it was inconsistent with Dr. Stromsdorfer's own treatment notes (Tr. 15-16).  In particular, the ALJ noted that Dr. Stromsdorfer consistently assessed Plaintiff with a Global Assessment of Functioning (GAF) score of sixty (Tr. 16, 492, 494, 498, 499 [describing Plaintiff's GAF score as a "60+"], 500 [same], 502 [same], 506, 507, 510, 516), which the ALJ stated represented only "mild" symptoms (Tr. 16).  The ALJ also observed that Dr. Stromsdorfer's treatment notes frequently described Plaintiff as alert and calm, with intact concentration (Tr. 16, 494-502, 506-508).  Dr. Stromsdorfer also frequently found that Plaintiff had intact orientation and logical thinking (Tr. 494-502, 506-508).  The ALJ correctly considered inconsistencies between Dr. Stromsdorfer's opinion and his treatment notes in weighing his opinion.

The ALJ also explained that he discounted Dr. Stromsdorfer's opinion because it was inconsistent with and unsupported by other evidence in the record (Tr. 16).  Specifically, the ALJ

16

noted that Plaintiff's mental impairments had never required emergency room care or hospitalization (Tr. 16). The ALJ also observed that Plaintiff had failed to seek or receive psychological counseling, and that he, instead, treated his allegedly disabling mental health symptoms with medication only (Tr. 16). The ALJ correctly considered these additional facts in discounting Dr. Stromsdorfer's opinion.

In addition, the ALJ explained that he discounted Dr. Stromsdorfer's opinion because it was inconsistent with and unsupported by Plaintiff's demeanor and ability to respond to questions at the hearing (Tr. 16). Plaintiff's hearing testimony demonstrated that he was able to concentrate, remember, and answer questions throughout the duration of the hearing, which lasted more than thirty minutes (Tr. 25-46). He answered questions about his complicated work history from 1995 through 2009, symptoms, and other matters, without difficulty (Tr. 25-46). The ALJ correctly considered Plaintiff's demeanor and ability to respond to questions at the hearing in weighing Dr. Stromsdorfer's opinion.

Finally, the ALJ also explained that some of Dr. Stromsdorfer's statements addressed the ultimate issue of disability, which only the Commissioner may decide (Tr. 36). 20 C.F.R. Sections 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, at *2. An opinion on an issue reserved to the Commissioner is not a medical opinion. *Id.* Rather, it is an administrative finding that is dispositive of a case, i.e., whether a claimant is disabled under the Act. *Id.* Final responsibility for deciding such an issue is reserved to the Commissioner. Here, to the extent that Dr. Stromsdorfer opined that Plaintiff was "disabled" or unable to "work" (Tr. 492), the ALJ correctly noted that the opinion was not entitled to controlling weight or special significance (Tr. 15). In conclusion, the ALJ provided good reasons, supported by substantial evidence, for discounting Dr. Stromsdorfer's opinion that Plaintiff was unable to work.

Next, Plaintiff argues that the ALJ improperly weighed Dr. Stromsdorfer's and Dr. Singer's opinions (Pl's Br. 13-17). Plaintiff contends that the ALJ erred by failing to provide reasons for

rejecting their opinions (Pl's Br. 16-17).  In support of this argument, Plaintiff states that the ALJ "barely mentioned the opinions of [his] treating physicians, merely disposing of the entire opinions as 'reserved for the Commissioner'" (Pl's Br. 16).  However, the ALJ provided good reasons, supported by substantial evidence, for rejecting Dr. Stromsdorfer's and Dr. Singer's opinions.

Plaintiff also argues that some of the reasons the ALJ gave for discounting Plaintiff's treating physicians' opinions were flawed (Pl's Br. 17-18).  Plaintiff objects in particular to the ALJ's statement that a GAF score of sixty represents "mild" symptoms (Pl's Br. 17-18).  Plaintiff correctly points out that a GAF score of sixty indicates "moderate" symptoms, rather than "mild" symptoms (Pl's Br. 18).  But Plaintiff's argument that the ALJ's misstatement requires remand or reversal is hereby rejected as harmless error.  Plaintiff fails to recognize that a GAF score of sixty is only one point shy of the range of scores indicative of "mild" symptoms, and that it represents the highest possible level of functioning within the category of "moderate" symptoms.  This assessment of Plaintiff's mental functioning is clearly inconsistent with Dr. Stromsdorfer's opinion that Plaintiff's mental impairments were totally disabling, and the ALJ correctly considered that inconsistency in weighing Dr. Stromsdorfer's opinion.

Plaintiff contends that the ALJ erred by "overlook[ing] Dr. Singer's positive findings on clinical examinations," including findings of decreased mobility, muscle spasms, tenderness, and a positive straight leg raise test (Pl's Br. 15).  Plaintiff also alleges that the ALJ ignored "positive findings from [Dr. Stromsdorfer], including dysphoric appearance, anxious and depressed mood and affect, and even irritable and manic affect" (Pl's Br. 15).

However, the ALJ stated that he considered all the evidence in the record in reaching his decision that Plaintiff was not disabled (Tr. 12).  In fact, the ALJ acknowledged that the medical evidence showed "some tenderness of [Plaintiff's] spine with some restricted range of motion" (Tr. 15).  Furthermore, the ALJ noted that Dr. Black observed "give way weakness" on examination (Tr.

18

15).  The ALJ also acknowledged that Dr. Stromsdorfer's treatment notes showed "some symptoms of depression" (Tr. 16).  Plaintiff's contention that the ALJ ignored this evidence, therefore, is incorrect.

Hence, the reasons given by the ALJ for discounting Dr. Stromsdorfer's and Dr. Singer's opinions are supported by substantial evidence.

Next, Plaintiff argues that the ALJ improperly evaluated certain evidence (Pl's Br. 18-19). Plaintiff argues that it is "improper for an ALJ to make a determination based on personal observation of a claimant at a hearing" (Pl's Br. 18).  Plaintiff also argues that the ALJ placed "undue emphasis" on the objective medical evidence in evaluating Plaintiff's fibromyalgia (Pl's Br. 18-19).  Both of these arguments are rejected.

Plaintiff's first argument fails because it is not supported by law forbidding an ALJ to consider a claimant's hearing demeanor.  *See, e.g., Push v. Sec'y of Health & Human Servs.,* No, 87-2189, 865 F.2d 260, at *2 (6th Cir. Dec. 5, 1988).  In *Push,* for example, the Sixth Circuit approved of an ALJ's consideration of a claimant's hearing demeanor in evaluating the severity of the claimant's fibromyalgia.  *Id.*

Plaintiff's second argument, that the ALJ placed "undue emphasis" on the objective medical evidence in evaluating Plaintiff's fibromyalgia (Pl's Br. 18-19), is also incorrect.  The ALJ did not rely solely on the objective medical evidence in evaluating the severity of Plaintiff's fibromyalgia.  The ALJ also considered the subjective evidence in the record, including Dr. Singer's treatment notes, Dr. Cummings' opinion, and Dr. Cantrell's treatment notes and opinion, and other evidence (Tr. 13-14).

Dr. Singer's treatment notes show that Plaintiff reported that his fibromyalgia symptoms were relieved with pain medications (Tr. 14, 404, 408, 422, 427, 432, 437, 456, 458).  Dr. Cummings opined in February 2010 that Plaintiff could perform "full duty: work as of February 12, 2010, notwithstanding his history of fibromyalgia (Tr. 13-14, 283).  In March 2010, Plaintiff told Dr.

Cantrell that he had experienced some improvement in his mid-thoracic pain with physical therapy (Tr. 14, 297), and in April 2010, he reported improvement again (Tr. 369).  In that month, Plaintiff was observed opening the hood of a car that was not functioning and holding up the hood while he leaned over the engine (Tr. 14, 369).  He also reported that he recently returned from a 1,700 mile car trip due to the death of his stepson's father (Tr. 369).  Dr. Cantrell opined that Plaintiff was capable of "performing all regular duty activities without restrictions" (Tr. 14, 370).  Finally, the ALJ also noted that Plaintiff had not received any injections to treat his complaints of pain (Tr. 16).  The ALJ considered this evidence in evaluating the limitations imposed by Plaintiff's fibromyalgia and his other impairments.

Next, Plaintiff argues that the ALJ erred by relying on the VE's response to a hypothetical question that did not include all the limitations imposed by his impairments (Pl's Br. 20-23).

An ALJ may rely on VE testimony to determine whether a claimant can perform past relevant work or other work that exists in the national economy.  20 C.F.R. Sections 404.1560(b)(2), 404.1566(e), 416.960(b)(2), 416.966(e).  The ALJ should accept the VE's testimony in response to a hypothetical question that includes the work-related limitations that the ALJ finds are supported by the record. *Miller v. Sec'y of Health & Human Servs.,* No. 89-6579, 895 F.2d 1414, at *2 (6th Cir. Feb. 9, 1990) ("Hypothetical questions posed to the expert witness need only enumerate those physical and mental impairments of the claimant which the ALJ finds supported by the medical evidence in the record.").

In this case, the ALJ correctly relied on the VE's testimony in response to a hypothetical question incorporating the limitations assessed by Dr. Threlkeld, which were supported by Dr. Cummings' and Dr. Cantrell's opinions, and other evidence in the record (Tr. 17, 332-37).

Plaintiff argues that the ALJ's hypothetical should have included additional limitations (Pl's Br. 21). In support of this argument, Plaintiff cites to several pages of the record that purportedly show

that he had physical limitations, including bending, twisting, and manipulative limitations, and mental limitations, including limited ability to handle conflict or stress, make decisions, interact with others, and follow simple instructions, that were not encompassed by the ALJ's hypothetical (Pl's Br. 21). Plaintiff's argument is rejected.  The records he cites do not show that he had limitations unaccounted for by the ALJ.  In addition, to the extent the cited records show any additional limitations, the ALJ declined to include them in the hypothetical question he posed to the VE.

Because the records do not support greater limitations than were included in the ALJ's hypothetical , this argument also fails. Plaintiff cites Dr. Cummings' records from February 2010 (Pl's Br. 21).  Those show that Plaintiff complained of back pain, worse with twisting, and "some tingling in his hands" (Tr. 284).  They also show that Dr. Cummings opined that Plaintiff's complaints did not impose significant functional limitations; Dr. Cummings opined that Plaintiff was "fit for full duty" work, without restrictions (Tr. 283).

Plaintiff also cites Dr. Bandlamudi's treatment notes from September and October 2009 and June 2010 (Pl's Br. 21).  Notes from September and October 2009 show that Plaintiff denied decreased range of motion and had full strength in all four extremities (Tr. 376-77).  X-rays of his feet, hands, pelvis, sacroiliac joints, and wrists were within normal limits (Tr. 377-78).  Plaintiff told Dr. Bandlamudi that he was unable to "walk two miles" or "participate in sports," but could otherwise perform all activities (Tr. 381).  Dr. Bandlamudi's notes from January 2010 again show that while he stated that he could not "walk two miles" or play sports, he could perform all other activities (Tr. 374).  Overall, he felt closer to "very well" than "very poorly" (Tr. 374).  Notes from June 2010 show that Plaintiff told Dr. Bandlamudi that he was "feeling better," and that his "fibromyalgia [was] better" (Tr. 372-73).

Plaintiff also cites Dr. Singer's notes from December 2009 and February, March, and June 2010 (Pl's Br. 21).  In December 2009, Dr. Singer opined that Plaintiff's back pain was of "moderate"

21

severity and "improving:" (Tr. 445).  And although Plaintiff complained of pain when bending or twisting, he also stated that it was relieved with medications (Tr. 445).  Notes from February 2010 demonstrate further improvement in that month, although Plaintiff complained on February 2 that it was "very difficult" to meet home, work, or social obligations (Tr. 273), he stated on February 18 that it was only "somewhat difficult" to meet these obligations, and he again stated that his symptoms were relieved with medications (Tr. 276).  In June 2010, Plaintiff reported once again that his pain was relieved with medications (Tr. 442).

Plaintiff also cites Dr. Dunn's opinion that Plaintiff "retains the capacity to complete simple to complex work activity with occasional interruptions in task forces due to mood [symptoms]," and that he "would be more likely to succeed in heavily-routinized work settings" (Pl's Br. 22; Tr. 352).  Dr. Dunn's opinion supports the ALJ's RFC assessment.  The ALJ found that Plaintiff could perform a limited range of light work that involved understanding, remembering, and carrying out simple instructions; non-detailed tasks; and adaptations to routine or simple work changes (Tr. 12).  Hence, Plaintiff's argument that the ALJ's hypothetical should have included additional limitations is not supported by the portions of the record Plaintiff cites.

Also, the ALJ provided specific reasons, supported by substantial evidence, for finding that Plaintiff was not entirely credible (Tr. 16-17).  Furthermore, the ALJ also gave good reasons, supported by substantial evidence, for rejecting Dr. Stromsdorfer's and Dr. Singer's opinions.  Thus, based upon the record as a whole, the ALJ correctly declined to incorporate additional limitations in the hypothetical question he posed to the VE.

The ALJ properly relied on the VE's testimony in response to a hypothetical question, including all the limitations that were supported by the record.

**VIII.   CONCLUSION**

Based upon a review of the  record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform work that exists in significant numbers in the national economy.


Dated: October 31, 2012                         _____/s/George J. Limbert_____
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE